IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH peter_burno@icloud.com THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC | Case No. 3:19-MJ-00578-MMS |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Jared Lonborg, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with Apple ID peter_burno@icloud.com (hereinafter the "SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cuptertino, California. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2. I am a United States Postal Inspector, assigned to investigate the unlawful transportation of contraband, including Title 21 controlled substances, through the United States Mail.



NOV 2 7 2019

Page 1 of 26

3. I have been a Postal Inspector since August 2015 and I am currently assigned to the Seattle Division of the United States Postal Inspection Service (USPIS), specifically to the Anchorage Domicile, which is responsible for the investigation of controlled substance law violations involving the United States Mail.

4. As part of my duties as a U.S. Postal Inspector, I investigate drug trafficking organizations, including their smuggling routes and the techniques that they use for transporting controlled substances such as marijuana, cocaine, methamphetamine, and heroin. My duties include investigating drug trafficking organizations, interviewing witnesses, victims and suspects, identifying people involved, developing probable cause for cases, handling and processing various types of evidence, and assembling cases for prosecution. I have conducted and/or participated in numerous investigations relating to the use, possession, manufacture, and trafficking of controlled substances, and I have become familiar with devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. I have also conducted and/or participated in investigations which have resulted in the seizure of marijuana, cocaine hydrochloride, opium, heroin, methamphetamine, MDMA (ecstasy), prescription medications, firearms, cellular phones, surveillance systems, cameras, memory cards, computers, documents, money, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances which have added to my knowledge of the illegal drug culture that exists in Alaska.

5. Through instruction and participation in such investigations, and through my conversations with other law enforcement officers with whom I work, I know that:

Page **2** of **26**

NOV 2 7 2019

a) The distribution of controlled substances is an activity that continues over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. I have learned that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. I have also learned that drug traffickers often have records of customers, as well as evidence of suppliers and co-conspirators, in one or more cellular telephones, either in the contact lists, sent or received calls, or text messages. These items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.



NOV 2 7 2019

b) In *United States v. Terry*, F.2d 272 (9th Cir. 1990), *United States v. Angulo-Lopez*, 791 F.2d 1394,1399 (9th Cir.1986), *United States v. Hernandez-Escargega*, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in *United States v. Fannin*, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in *United States v. Cardoza*, 769 F. 2d 625, 630 (9th Cir. 1985), that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

c) Individuals involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly take measures to insulate/distances themselves from their illicit activities, as well as the instruments used therein, to include premises, vehicles, firearms, and telephones. These measures include the use of real or fictitious nominees for transactions and activities which require the presentation of identification. Examples of these measures include: the use of premises rented, owned, or maintained by others (to include the use of others in opening utility accounts); the use of cellular telephones held in another's name; the use of others to ship and/or receive money and/or controlled substances; the use of others to purchase and/or store firearms, and the use of others to directly interact with the drug customers during the transactions. These measures also include the use of vehicles rented or owned by others, as well as the failure to transfer the title

Page **4** of **26**



NOV 2 7 2019

to newly purchased vehicles from the previous owner to the trafficker or even a nominee.

d) It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I have learned through the experience of other law enforcement officers that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

e) It is common for members of drug trafficking organizations to possess scanners, security cameras and communications equipment (i.e. cellular telephones, fax machines and computers with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Computer equipment is also used by members of drug trafficking organizations to store records related to drug trafficking and money laundering activities. All of these items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the

Page **5** of **26**



NOV 2 7 **2019**

surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

f) It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

g) It is common for members of drug trafficking organizations to maintain telephonic communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call

Page **6** of **26**



NOV 2 7 2019

logs or text messages, are frequently maintained in the cellular telephone's memory, iCloud account, or Facebook account.

h) It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name, but could be linked to the same iCloud account. A different subscriber name and/or telephone number is often used by members of a drug trafficking organization to thwart law enforcement detection of their illicit drug trafficking activities. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Due to the fact that several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text messaging history or within the contacts section of the cellular telephone and could be stored in the iCloud account.

i) It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and

NOV 2 7 2019

expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained on the iCloud account.

j) Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

6. Further, through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods used to disguise their narcotics activities. From experience and training, I have also learned that narcotics traffickers frequently use encrypted cellular telephone applications, cellular phone services, and other technologies to communicate, conduct, and conceal their illegal activities from law enforcement.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 846 and § 841, the Distribution of Controlled Substances, the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations, and 18 U.S.C. § 1956 and § 1957, Money Laundering, and conspiracies to do the same and aiding and abetting the same have been committed and that the items described in Attachment A are evidence, fruits, instrumentalities,

Page **8** of **26**

NOV 2 7 2019

and proceeds of those violations are located at the location described in the accompanying search warrant. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

9. On November 4, 2019, USPIS in Anchorage, AK executed federal search warrant 03:19-MJ-00518-MMS on Priority Mail Express parcel EL462158058US (herein referred to as the Subject Parcel) addressed to "Todd Brown, 216 Skwentna DR., Anchorage, AK 99504" from "D. Rheinschild, 4326 W. 142 ST #10, Hawthorne, CA 90250." Inside the parcel was approximately 3,816.62 gross grams of a white crystalline substance which field tested positive for methamphetamine. Based on my training and experience, this amount of methamphetamine is indicative of a distribution quantity based off of a single dosage unit typically ranging from 50-100 milligrams or more, depending on how it is ingested.

10. Further investigation revealed that the Subject Parcel was linked to a prior investigation that the Anchorage Airport Interdiction Team was involved with in July of 2019, in which Peter Michael BURNO, an Alaska resident, was obtaining controlled substances at the pound or higher level from California. BURNO obtained these controlled substances in multiple ways, including using parcel shipping services to have them sent to Alaska and by traveling to California to obtain controlled substances in person. Law enforcement in California seized a parcel containing approximately three pounds of controlled substances which BURNO was suspected of shipping.



NOV 27 2019

11. On November 4, 2019, I determined through the research of postal databases that phone number 907-202-0091 requested SMS text message updates to track the Subject Parcel. I conducted further research on this phone number and determined the phone number is registered to BURNO.

12. On November 5, 2019, federal beeper order 03:19-MJ-00522-MMS was signed, authorizing the installation and monitoring of an electronic alerting device and electronic tracking device in the Subject Parcel and recovery of these devices by entry to the premises where the Subject Parcel is opened.

13. On November 5, 2019, a controlled delivery was conducted of the Subject Parcel at the recipient's address in which the seized narcotics were removed and a representative sample of the methamphetamine was placed inside of the Subject Parcel.

14. On November 5, 2019, at approximately 2:25 PM, the Subject Parcel was delivered to the recipient address of 216 Skwentna Dr, Anchorage, AK 99504 by an agent acting in an undercover capacity. Two males in a vehicle were waiting at the address and immediately took possession of the Subject Parcel. Law enforcement then followed these individuals to an address in Wasilla, AK, at which time law enforcement received a signal from the electronic monitoring device installed in the Subject Parcel indicating the Subject Parcel had been opened inside of the residence. Law enforcement executed the federal beeper order and subsequently applied for and was granted a search warrant for the address and the vehicle that transported the Subject Parcel to this residence. Several suspects were taken into custody at this location for further questioning. The Subject Parcel was discovered open on the kitchen floor of the residence. In



NOV 27 2019

Page **10** of **26**

Addition, a scale was found on the kitchen counter within several feet of the Subject Parcel and multiple firearms were recovered during a search of the residence.

15. On November 5, 2019, law enforcement reviewed text messages and communications between BURNO and other individuals involved in the investigation, which indicated the individual who accepted the Subject Parcel was retrieving the Subject Parcel for BURNO because he was in California making inquiries about the Subject Parcel since it was not delivered on time.

16. On November 6, 2019, BURNO traveled from Los Angeles, CA to Anchorage, AK. He was taken into custody by law enforcement upon his arrival at the Ted Stevens International Airport.

17. During a post-arrest interview, BURNO stated he recently moved into 216 Skwentna Dr., Anchorage, AK 99504. BURNO was also found to have a key to the front door to this residence in his possession at the time of his arrest. In addition, BURNO was in possession of a gold in color iPhone assigned call number 907-202-0091 which requested SMS text message tracking updates for the Subject Parcel and BURNO was wearing an Apple Watch.

18. On November 6, 2019, an Apple iPad was seized during the execution of a search warrant which was obtained for a blue in color Samsonite carry-on sized roller-bag which BURNO had in his possession at the time of his arrest at the Ted Stevens International Airport on November 6, 2019. The Apple iPad was found inside the roller-bag.

19. On November 6, 2019, a search warrant was obtained and executed by law enforcement on BURNO's residence of 216 Skwentna Dr., Anchorage, AK 99504.



NOV 2 7 2019

Page **11** of **26**

20. As a result of the search warrant served on BURNO's residence, law enforcement found a laminated identification card for BURNO, two scales with white powdery residue, and an empty USPS Priority Mail Express parcel. The empty USPS parcel still had the USPS Priority Mail Express shipping label affixed to it. On the label was the same return address and name that was listed on the Subject Parcel and both parcels had an identical phone number listed on the label. The parcel found at 216 Skwentna Dr. was also similar in weight and had noticeably similar handwriting as the Subject Parcel. The parcel was mailed on October 21, 2019 from Inglewood, CA and addressed to 2841 Leawood Dr., Anchorage AK 99502. BURNO stated in his interview with law enforcement that he used to live at this address. Law enforcement also determined BURNO's vehicle is registered to 2841 Leawood Dr., Anchorage AK 99502.

21. During a follow-up interview with BURNO, he stated he began trafficking narcotics in April of 2019 when he was introduced to a source of supply in Los Angeles, CA. In addition, he stated he knew he was going to be arrested upon his arrival in Anchorage and that he "wiped" his Apple devices prior to his arrival in order to delete any incriminating evidence stored on the devices. In addition, BURNO provided the name of his iCloud account as peter_burno@icloud.com and reported that the information on his phone pertaining to his drug trafficking activities should be stored on this iCloud account.

22. Based on my training and experience as a Postal Inspector, and involvement in this investigation, your affiant knows that drug traffickers commonly use cellphones and/or other electronic communication devices to communicate and facilitate the distribution of controlled substances. These devices are their primary means of communication. Electronic devices used by drug traffickers and associates frequently contain evidence regarding the dates and times of

NOV 2 7 2019

criminal associates' visits, purchasing narcotics, and contacts. Electronic devices often contain evidence of the sale of illegal substances, their location of the sale and other evidence pertinent to this investigation.

23. Based on the information provided herein, I submit there is probable cause to search the SUBJECT ACCOUNT.

## INFORMATION REGARDING APPLE ID AND iCLOUD

24. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

25. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

a) Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b) iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c) iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

Page **13** of **26**

NOV 2 7 2019

d) iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices. iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e) Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

f) Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g) App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be

Page **14** of **26**



NOV 2 7 2019

purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

36. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

37. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

38. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to

Page **15** of **26**

NOV 2 7 2019

connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

39. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

40. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

Page **16** of **26**

NOV 2 7 2019

41. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

42. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of methamphetamine trafficking, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

43. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in

Page **17** of **26**

NOV 2 7 2019

furtherance of narcotics and firearms trafficking, including to communicate and facilitate the sale of narcotics.

44. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

45. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. For instance, based on my experience investigating narcotics

Page **18** of **26**

traffickers, I know that traffickers frequently communicate using the following applications, but not limited to, WhatsApp, Instagram, Telegram, Facebook Messenger, etc. In addition, emails, instant messages, banking applications, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

47. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

48. Based on the above examples, I therefore submit that information stored on Apple's servers will show evidence of the crimes of conspiracy to distribute controlled and/or money laundering. More specifically, and as previously stated, there is probable cause to support that the user information, IP addresses, photographs, text messages, and apps downloaded will show evidence that BURNO distributed controlled substances and/or participated in money laundering activities.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

Page **19** of **26**

NOV 2 7 2019

government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## AUTHORIZATION REQUEST

50. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

51. I further request that the Court direct Apple to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control within seven (7) days. Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## CONCLUSION

52. Based upon the foregoing, your affiant submits this affidavit as probable cause to believe Peter BURNO is in violation of 21 U.S.C. § 846 and § 841, the Distribution of Controlled Substances, the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations, and 18 U.S.C. § 1956 and § 1957, Money Laundering, and conspiracies to do the same and aiding and abetting the same have been committed, and is requesting a search warrant be granted authorizing the examination of the iCloud account peter_burno@icloud.com.

53. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) &

Page **20** of **26**

NOV 2 7 2019

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that — has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

54. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.

Respectfully submitted,

Jared Lonborg, U.S. Postal Inspector
United States Postal Inspection Service

Subscribed and sworn to before me this ___ day of November, 2019.

UNITED STATES MAGISTRATE JUDGE

